February 24th, 1818, the Judges delivered their opinions.
Judge Coalter.
1 shall consider the tenants in this case as holding estates for the life of Mrs., Smith, as well because it is so limited by the Will, as because that limitation is perhaps not done away, or enlarged to a fee, by a charge in gross upon the land, which the tenants might he compelled to pay, at all events, whether they received profits, or not, to the amount.(a) But taking it, at pi’esent, that they are only bound to pay the legacies out of the profits, if so much are received; leaving it as a question hereafter to he decided whether, in default of profits sufficient, they are or are not to be paid, should such question ever arise; 1 shall proceed io enquire whether the Tenants are to he laid under the restraint, as to the use of the water and fuel, prayed for, or any other restraint whatever?
First, as to the use of the water, and digging the new Well.
If this was a lease for life of the use of the salt well, I can see no reason why digging a new one within a small distance of the old, so as to communicate with the same fountain, should be restrained any more than opening new shafts to pursue the same vein of coal; (b) and the more especially as by such now shafts the w hole vein *138 may be exhausted, which it is not pretended could happen. as to this fountain of water. I think, therefore, that the new Well may lawfully be dug and used, in the manner, and for the purpose stated in the bill and answer,* and that, as any quantity of water might lawfully jiave j,een drawn from the old Well, so it may from the. hew, eveii if the fountain itself should he dried up there - by, but which is believed to be impossible.
Second, as to the use of fuel.
There seems to be no doubt that the devise of the salt works is not to he restricted to the well alone, hut that it extends also to the use of that mountain woodland Which seems to have been acquired for the purpose of Supplying fuel, without which the salt water would he of little usés The Bill itself seems to admit that a use of fuel to the utmost extent that the testator used it, would he properly taken according to the intention of the Will, and would not be waste. But the extent of the weed-lands, their capacity of re-producing timber of equal Valué foi‘ fuel with that now upon them, and whether the Wood-cutting proceeds more or less rapidly than such re-productioh, is not stated! nor does it appear that fuel éan othferwis'e be procured. If a restraint is to take plate, the Use by the testator might be an improper standard, Us he may have used it imprudently, or not to the extent that prudence would admit, or to which he would havfe used it on the increase of his funds, or as the demand for the article, or the competition in market, Which has Since taken place, would require, in order to continue the profits as great. It is therefore possible that a more full developement of facts might change my opinionj these cases depending very much upon the circumstances attending each case,* and consequently, any opinion now given by me, perhaps, ought not to conclude the parties, should a different case hereafter he made out! and will certainly not be intended to authorize malicious or extravagant waste, and which a tenant without impeachment of waste would be restrained from, 'sommittingi
*139 Considering this then as a devise as well of the use of the water as of the woodland for fuel, and that the use of the former is unlimited, is the use of the latter uiir limited also?
Let us consider it, in the first place, by analogy to House-bote, Fence-bote, &c. The house or the field, which is the principal, may be used, during the term, to any extent, not amounting to waste, and maybe kept in constant repair, although it may require all the timber or fence bote on the land, for that purpose; and so of fire-bote. The party having the right to these bptes, and using them in the regular way, can not he restrain-! ed from taking the whole, if such use requires the whole. So, here, the Well is as the field to be cultivated, and requires a use of wood commensurate with the use of war ter, and, if prudently used to that extent, any other restraint would seem contrary to the principle aboye declared in the cases of botes.
But, again, in the case in Hobart 234, which was an action of waste for felling oaks, &c., the defendant; pleaded that he had a lease to him of all mines &c„ and that he felled the oaks to make certain utensils about, the mines, without which they could not be used, It appeared that the Landlord had been in the habit of taking the same kind of timber for the same purpose, and also the Tenant, on some previous occasions. The maxim, “ that the grant of a thing carried all things included without which the thing granted could not be had,” was held not to avail the defendant in this case; for that grant is to he considered of things incident and directly necessary. But, suppose the use of timber, for these purposes, had in that case been inádenl and directly necessary to the use of the main thing granted, or had been granted also with it, (one or the other of which, seems to he the case here,) could the party have been restrained, if, in using the mine to the extent he had a right to use it, it became necessary to use the whole of the timber for these purposes?
This case too supports my position that the use by the Testator is not a proper criterion in favour of a Tenant,, *140 as the owner of the fee may waste or use his tim~ her as he pleases; and if it is no criterion in his favour, it oc lit not to be against him.
But this case may perhaps be placed on yet higher ground in favour of the Tenants, who, if I am not mis, taken, may be considered as withoat impeachment of ~waste, or having an unlimited right to use the fuel, in order to effect the objects of the testator. I presume express words to that efFect are not necessary in a WilL but, in this respect as in all others, the intention shall prevail. In 1 Bro. Ch. cases, 166, a Testator devised land to his wife for life, and, by a codicil, he says, "Whereas, by my Will, my Wife cannot cut any tim"ber, now my Will and mind is that she may, whilst she continues my widow, cut timber, for her own use " and benefit, at seasonable times in. the Ijear," Under tbts power, she began to cut and sell. It was contended that she had not a right to cut timber for sale, but only for her own use on the estate, and for estovers. The Lord Chancellor utterly rejected this idea, that she was only entitled to cut for her own use on the estate &c.; and said she was entitled to cut every thing that could be called timber; in other words she was tenant without impeachment of waste. And in 1 Eq. cas. abr., 221, it is said, if there be a Jointress with a covenant that it shall be "worth such a yearly value, though her estate be not without impeachment of waste, yet she may do waste to make up the defect in value, and equity will not prohibit."
The parties here do not take by contract wherein each party would seek to make the best bargain, but, being the one the wife, and the other near relations either of the testator or Ms wife, were themselves objects of Ms affection and bounty: and, by means of this devise, too, other near relations and objects of very extensive bounty, are intended to participate in his munificence. He had no children in whom to vest this large estate, and, having numerous collaterals, he seeks to make a provision fortlicm, by inducing the devisees of his capital, whether vested in the salt works, or in merchandise, to take the *141 management thereof, and devote their time and labour, not only for their own benefit, as objects nearest his affection, but to raise extensive legacies for Ms other re.lation; providing, in case he should have a child, this arrangement should not take place. For what purpose should he limit the use of this property, in favour of one collateral relation, when such limitation might prevent, within the life of his wife, the making a sufficient clear property to pay the legacies to others, and might also prevent the wile, and the other devisees of the life estate, from that gain which they had a chance to make, during the said estate, and which was as well the desire of the testator in their favour, as the great inducement on which they would he expected to undertake so important and hazardous a business? Suppose the legacies had failed, in consequence of these devisees not pushing the business as far as the funds placed in their hands would justify; could they lie considered as fulfilling the object and desire of the testator, or acting justly by the legatees?
For these reasons, my strong impression at present is, that the Testator intended a free and unlimited use of Ms capital; whether consisting of monies, salt mineral, or woodland; especially, as the quantity of the latter may-have been so great as that lie may have supposed the capital given, and it’s probable increase, could not, during one life, produce a lasting had effect to the remainder-man, and was therefore willing to risque this in favour of persons equally dear to him, and as a boon to them for undei'taking the task.
It is not contended, (nor do I intend to say such allegation would alter my opinion,) that any new Capital has been, or is likely to be introduced, or that the money part of it turned out to be greater than was expected by Mm. On the contrary, it is stated that the reverse is the fact as to the mex*cantile traxxsactioxxs, which have been absorbed by the payment of debts; so that a large portion of the bounty which these parties wore expected to take, (and, consequently, their means of cai’rying oix the works still more extensively,) has failed.
Upon the whole, I am fox* affirming the Decree.
*142 .Tudge CAIiniL.
The. law of waste, in Euglaiid, va~ ries and accommodates itself to the varying ~vaiits and situations of the different counties in that country. Thus, what is waste in one county, is not waste in another.On the same principle, the law of waste, in its applica-. tion here, varies and accommodates itself to the situation of oar new and unsettled country.
The questiom~ in this case, as to the iights of the ap~ pellees under the Will of William King, relate to the use of certain water impregnated with salt, and to the t~se of the wood, on the lands of the said Kin~ necessary for converting that water into salt.
The clause in William Kimg's will, on which this con~troversy depends, is in the following words. "During the life time of my wife, it is my intention and i~quest that " Willi~ni Trigg, James King and her do carry on my " business in co-partnership, both Salt Works and Mer- " chandizing, each equal shares; and that, in considera- `• tion of the use of my Capital, they pay, out of the same, "the following legacies."
The 1e~aeIes a~e then specified, arnountin~, as appears from the answers, to about $70,000. I refer to the answers, because the amount cannot be ascertained from the Will itself, as many of the. legacies are given to per.. sons described, not by name, but as the clii1drei~ of certain parents, without mentioning the number of children. As the Answers, however, are not replied to, the facts which they state in relation to the controversy, whe.. tTiei~ responsive to the Bill or not, must be taken to be true.
First, as to the water.
The answers, entitled to respect as aforesaid, shew ~hat the new Well which the appellees are sinki1ig, is not for the purpose of reaching any new vein of water; but as the only practicable mode of using the old vein. The case of Clavering v. Clavering (2 P. Wms. 388,) is conclusive to shew, that tenant for life, of Coal mines, e.yeu when not without impeachment of waste., may open new pits or shafts for working the old vein of Coal. The reason on which that case was decided applies forcibly to *143 this; viz. that otherwise the works could not be carried on. The objection to the new Well being thus removed, the question is only as to the extent to which the appellees may use the water of the old vein: and, on this point, it is contended by the appellants, that no greater quasi-titles ought $o he used than were used by King himself about the time of his death. In England, a tenant for life or years, of land in which there were mines of coal, or the like, opened at the time of the lease, may work them and take the profits, even although the lease does hot mention the mines; (Co. Lit. 54, h, ) and 1 have been unable to find that the tenant in such case was ever restricted in the use of the mine, even although such use should entirely exhaust it before the determination of his estate. But the facts stated in the answer in this case, lead to the belief that the saline Mineral is inexhaustible. These facts were well known to William King the testator. When therefore, he expressly granted by his will, to the appellees, the use of this w ater, he could have had no possible motive to restrict them in its enjoyment: and, in the absence of all express restrictions, it wall be difficult, in such a case, to raise them by implication.— There are, on the contrary, the strongest circumstances in the Will itself, to shew that he intended no restrictions whatever. The tenants for life were his wife, his brother, and the husband of his niece. He intended to give them a beneficial interest. When, therefore, lie limited its duration to the life of Mrs. King, which might terminate shortly after his own, and charged it with the payment of $70,000, a considerable part of w hich was payable in a lew years after his death, it can hardly be supposed that he intended to restrict them in the use of the salt water, (perhaps the principal source from which the legacies were to be raised,) especially when lie considered that w ater to be inexhaustible. Thus to restrict them, might be to defeat, entirely, the bounty intended for them.
1 do not contend that the tenants for life became bound, by accepting the devise in their favour, to pay, at all events, the several sums directed to be paid as the con sideration of that devise, J believe they were bound to *144 pay put of the profits only; and that the determination of their estate, before the profits could pay the debts, would discharge them from the payment of the residue. But ^*ey would be bound to the extent of the nett profits.—■ Suppose then, Mrs. King should die precisely at the time that the profits should amount to $70,000, it is clear that the tenants for life would not receive one cent for themselves. A construction leading to such a result, ought not, I think, to he favoured:—and, even as to the legatees of the $ 70,000, who were his near relations, a restricted use of the water might have protracted their payment to a most unreasonable length of time. If it be said that these legacies are so charged on the Capital, that they would not be lost by the death of the tenants for life, but that the reversioner or remainderman would he liable for them; this would only shew that he has the less reason to object to such use of the Capital by the tenants for life, as would enable them to discharge the legacies.
On these grounds, I do not think the testator intended any restriction in the use of the water.
Secondly. The remaining question is as to the Wood necessary for converting the water into salt.
The Will requests the Tenants for life to carry on his « business, in copartnership, both Salt Wox*ks and Mer- « chandizing.” Fuel was an essential article for carrying on the Salt Works; and the wood on the Testator’s lands had been generally used for that purpose. The Bill itself states that the lands are of little value for cultivation, being generally too steep for that purpose; but are very valuable as affording fuel for the works. It expressly admits the right of the tenant for life to use as much of the wood as William King himself used at the time of his death:—and, even without that admission, I presume no one would hesitate in pronouncing that the will gives the right to use some wood in carrying on the Salt Worksj for they are to be carried,on with the Capital of the Testator, consisting, in part, of the water and the wood— The only question is, whether the Testator intended any restriction, as to quantity, so far as the wood is used in *145 prosecuting the salt works. And I will here observe that the arguments urged to shew a right to an unlimitcd use of the water, apply with equal force to a like use of the wood. They need not, therefore, be repeated.— And if, as I have endeavoured to prove, the testator intended an unlimited use of the water, can wo suppose that, in granting the use of wood for that purpose, he intended to limit that use? I humbly conceive that every principle of just construction would forbid such a conclusion. I conceive the use co-extensive with the object, which, in this case, is unlimited. This opinion is strongly fortified by the law on analogous subjects. In the cases of Ilouse-bote, hay-bote, plough bote, &c. the tenant is unrestricted so long as he does not exceed what may be necessary for the jmrpose; (7 Bac. ab. 254, and the cases there cited;) so, likewise, a ten ant who is generally restrained by the nature of his estate from cutting down timber, may nevertheless cut down timber for the purpose of repairing houses; nor is there any case in the hooks which I have seen, shewing that he may not use as much as may be necessary for such lawful purpose; even although he should cut, down the only timber tree on the land. Where there is a right to use a thing at all, the right goes to all the extent which a lawful object may require. In the case before ms, the object of converting the water into salt is a lawful one under this will, and is unlimited in the extent to which it may be carried: the use of the means by which the testator intended it should be accomplished, is, therefore, equally unlimited. We have before seen that a tenant for life of a mine of coal, may use it till he exhaust it, even although the interest of the reversioner or remainderman may be thereby entirely destroyed. If this be the case when the thing itself is consumed by the use, never to be reproduced, a fortiori, the right exists in the case of wood which wall reproduce itself in a series of years.
The case of Lord Darcy v. Ashwith, (Hob. p. 234), has not, as I conceive, any application. That was a case depending on a lease, and the point decided was that the lease did not give the right to use any timber for *146 ’ making utensils for working the mines. The present ■ case is one depending on a Will, in which, it is admitted by all, an intention is manifest to-give the right to uso some wood for carrying on the contemplated business.— The question in Hobart was whether there was any right, and it was decided the lease gave none. Here the right is admitted to be given by the Will, and the only question is as to the extent of that right; which, for the reasons above mentioned, I consider to be unlimited.
This is a case depending on a Will; and in such a case the intention governs. The tenants for life were the nearest and dearest objects of the testator’s affections and bounty. I cannot impute to him the intention contended for by the appellants; for it might, in consequence ol‘ the encreased expense of making salt, and the diminished price of the article stated in the answers, protract the payment of the legacies charged upon the life estate, till that estate might reasonably be expected to expire; and, in that event, convert these near and dear objects.of his affections, literally, into hewers of wood and drawers of water, for the sole benefit of others less dear to the Testator.
Nor am I for sacrificing the rights of the reversioner or remainderman. He may prevent any malicious waste, by application to a Court of equity. His rights are farther protected by one other circumstance; that the use of the wood and water will always be regulated by the demand for salt; and, in the absence of all positive restrictions by the testator, it is fair to presume that he considered the restriction which would necessarily result from the limited demand for salt, as being abundantly sufficient.
I am for affirming the Decree of the Chancellor.
Judge Brooice was of the same opinion.
Judge Roane.
This is a bill of Injunction, brought by the devisees in remainder of William King deceased, against two of Ms devisees for life, and Ms widow. It prays to enjoin them from committing waste, by opening Salt-Wells,1 and cutting and destroying timber, upon the premises therein mentioned. The bill is brought upon *147 the avowed assertion of an intention, as well as a right, on the part of the appellees, to open new wells at pleasure, and to use the water issuing therefrom, and also the wood standing on the premises, without stint or limitation. This threat and avowal is sufficient to justify the preventive interference of the Court, upon the authority of the case of Gibson v. Smith, 2 Atk. 183, if the ease made out should, in other respects, warrant such a measure.
As it is asserted, and not denied, that the saline Mineral is inexhaustible, and, it follows, that no injury is done to the inheritance by using all the water issuing from it, I shall not stop to consider whether the defendants have a light to open new wells, for the purpose of obtaining it. This is a point which, under other circumstances, might admit of controversy. I shall proceed upon the admission of this right; and then the question is narrowed to the enquiry, whether that right carries with it a right to cut down and destroy all the timber existing on the premises.
Before I go into that question, I will remark, that none of the appellees have more than an estate for life, in the premises. The widow renounced the devise under the M ill, and claims and holds the premises, merely in rigid of dower. As for the other appellees, they hold only during the life of the Widow, by the very terms of the Will. This circumstance, (standing alone,) would exclude them from taking a fee, (Cowp. rep. 840.), even if the charge upon the land had been of a sum in gross. They do not take a fee, for the further reason, that the charge is not of a sum in gross, hut the legacies are payable out of the profits only; and those payments, in general, are postponed to distant periods. 4 Bac. Abr. 251. The devise is of the use of the Capital, and the legacies are to be paid out of the same; that is, out of the use, or profits of the Capital. There is no pretence to say, from any facts stated in this record, that these profits are not entirely adequate to the payment, within a reasonable 'lime:—-but, if that incompetence were even shewn, it would not follow that the rights of the tenants would be *148 ei1^arSe<^ thereby. The terms of the Will must still prevail, as the devisees could not be thereby injured. As the appellees have hot a fee, they are only tenants for ^'e the premises. There is no clause in the Will exempting them from liability for Waste. As to waste,-j;]iey stand on a common ground with other tenants for life, except so far as a difference may result from the nature of the premises in controversy. If á difference does not result from this cause, it can not from the omission, to restrict Waste, in the Will. That omission became Unnecessary, from the limited nature of the estate which Was granted. The estate granted was only ah estate for life; and it is incident thereto that Waste shall not be committed. It would have been a Wbrk of supererogation to have inserted such a restriction; and the question may he properly retorted, Why, if it Were so intended, was not waste specially permitted by the Will? This is not only not done, but the contrary is done, by granting an éstate which carries with it the restriction,, as an incident. The silence of the Will, in this particular, can hot weaken the rights of those in remainder. It can not destroy rights conferred by the law.
In considering what is waste, in this Country, it is tó be remarked, that the common law, by which it is regulated, adapts itself in this, as in other cases, to the varied situation and circumstances of the Country. That Can hot be waste, for example, in an entire woodland Country, which would be so in a cleared one. The contrary doctrine Would starve a widow, for example, who could not subsist without cultivating her dower land, nor cultivate it without felling the timber. A clearing of the land, in such circumstances, would not be a lasting damage to the inheritance, nor a disherison of him in remainder, which is the true definition of waste. It Would, on the contrary, be beneficial to him in remainder, so long as a sufficiency of timber Was left. This variation of the law of Waste, not only exists in relation to a new Country, compared with a cleared one, but takes place as to different parts of the same Conn- *149 try. Thus, in England, some species of trees are held to he timber in some parts, and an object of w aste, which are not so in others. These obseri ations go to shew that the law, on this subject, must be applied with a reasonable regard to circumstances. It is believed, how - ever, that no circumstances, any where, justify the cutting down all the timber on the inheritance. It is giving every thing to the particular tenant, in prejudice of him in remainder. This is particularly the case, in the present instance, when, by cutting off all the timber, the land is useless for any other purpose; it being stated, if not admitted, to be too steep for cultivation. As the tenant for life is to procure a subsistence, by cutting down the land for the purposes of agriculture, so the remainder man is also to be permitted to get a subsistence by the use of a part of the timber. The whole must not he taken from him, whereby he will not be able to make any salt; and, especially, where the land is unfit for any other purpose. Under that combination of circumstances, (which is the one before ns,) the heir would literally starve, while the particular tenant was rioting in prolusion. The claims of the remainder-man and particular tenant should both be attended to, and he adjusted by a scale which consults the interests of both. The latter should be permitted to receive the golden egg, but not to destroy the goose which lays it.
If there were no salt works in the case before us; if the controversy was merely in relation to a common trad: of land, it is presumed the claim to destroy all the timber, w ould not be asserted. It would not be asserted, in the common case, where the premises, after clearing them, were useful for the purposes of cultivation; and much less in the case before us, where they are not so. Such a pretension would conflict with every principle of the law of waste, taken in relation to any Country. It would inflict a lasting damage on the inheritance. If that could not be done directly in that case, neither can it he done circuitously in this. It makes no difference to *150 the remainder man, whether his inheritance is directly or indirectly destroyed.
These remarks go to shew that, while there need be no resti’aint upon tlie particular tenants as to the water, for the reason that it can not be exhausted, the case is otherwise as to the wood. It is said that the wood, in this case, is an incident to the water. Without stopping to en-quire whether it be so or not, it is an incident as well for the benefit of the heir, as the particular tenant. If it is an incident, it should attend on, and its continuance should be commensu'rate with, that of the pi'incpal subject. The tenant should be permitted to use the incident, but not to destroy it. Such a destruction would he as fatal to the interests of the heir, as that of the principal subject itself. In relation to this incident, (if it be one,) as well as in relation to cutting timber in ordinary cases, the rights of both the parties should be set-tied, by a scale of exact equity and justice. The sense of the devisor, as to what the interest of the heir required, is ascertained by his own conduct during his lifetime. It is asserted, (and perhaps admitted,) that he purchased the wood, (in part,) to boil his salt with; and it is also shewn that Mr. Preston, with a view to save his wood, suffered his works to lie idle. It is admitted that salt can not he made without wood; but the conduct of Mr. King, a judicious owner of the inheritance, proved not only that it might, but that it ought to be made, in part, by wood other than that standing on the premises. It can he no hardship to impose terms on the particular tenant, in favour of him in remainder, which a judicious man, having both interests united in Ms person, imposed upon himself. This is, especially, the case, when those restrictions are precisely such as have been prescribed by the wisdom of the common law;—by that law which equally regards the just rights of both the parties.
As to the use of the wood being limited only by the demand for the salt, the argument proves too much. It would graduate the law of waste, not by circumstances existing on and peculiar to the land in question, hut by such as are extraneous and collateral. It would go to justify a lasting damage to the inheritance, where the *151 land is contiguous to a large market town, or to navigation, when it would not be tolerated, in a more remote situation. It would go, as applied to common cases, to permit a tenant to clear more or less of his land, according as he was more or less removed from a market town. It would lose sight of the criterion of waste, established by the wisdom of the common law for. ages, which respects the actual detriment to the premises, and substitute an extraneous and imaginary one for the first time introduced into the code.
As for the idea that the wood may he destroyed, because it reproduces itself by time, that argument would go to overthrow this kind of waste altogether. Besides^ in some soils, the new growth of timber not only takes a long time to arise, but is entirely of inferior quality. I may instance a particular region of Virginia, where, in place of hickory and white oak, the second growth is, entirely, of old field pine. Is it no injury to the inheritance, that this last kind of wood should be substituted for the former? Is the heir to ho fobbed off, with a kind of wood which is unfit to make any implement of agriculture, and is even worthless as fuel?
As to any supposed analogy between this case and the right of taking fire-bote, house-bote, and ploughbote, they are limited by tbe actual demand required upon the premises, whereas the pretension now assorted is to keep pace with tbe foreign demand for the article manufactured. This pretension is reprobated, also, by the restriction as to the bote itself, that it must not he unreasonable. If more is taken than is reasonable, the act of taking the bote becomes an act of waste. You can not take all the timber for the purposes of bote, if it he more than sufficient. The particular tenant can not augment his implements and enclosures beyond all reason, and waste all the timber on the inheritance in erecting, and keeping them in repair.
The ideas now stated are not to be supported by any English authorities, exactly in point. The reason is, that there are no salt works in that Country. There are, however, English cases which are analogous, and, in principle, entirely apply.
*152 In 7 Bac, 262, it is laid down that, where a man S'ra!)ts all his mines of coals, when there are none open, although this may justify the tenant in opening new ,1™0S> he can not justify the cutting timber trees for making puncheons and other utensils for working it, thou.igli, without them, he can not get at the coal/ and, by Hobart, the law is the same if the mine was open at the time. I cannot perceive any difference, between this case and the case at bar,'—which is not, (at least,) in favour of the latter. If the tenant in .that case was not permitted to take timber to make the necessary utensils/ if, without them, he could not dig any coal, shall all the timber be destroyed in the case before us, and the works he rendered useless to the heir, to satisfy the cupidity of the particular tenant?
In the case of the Bishop of London v. Webb, 1 P. Wms. 527, where a tenant for years, and that too without impeachment of waste, contracted with bi*iek makers to dig and work up the soil, thereby converting the pasture field into a pit or pond, he was injoined by the Chancellor from so doing, because it did a lasting injury to the inheritance/ and this, notwithstanding the clause of impeachment of waste. There is no difference in principle between that case and the one before us. There is none between making the land wholly useless by digging it into pits, and by taking off all the timber, when the land itself is afterwards entirely useless, it being too steep for cultivation. If it be said that this land will hereafter grow up again in timber of some kind, that may not be in the time of him next in remainder. It is, quoad him, substantially, an entire destruction. It is, as to him, like destroying the land by opening of pits, in the case first mentioned. The objection prevailed in that case too, notwithstanding the demand for the bricks was unlimited/ the land being near to London, . The pretension now set up, of graduating the power by the demand, was in that case utterly disregarded and exploded. A safer and juster criterion was resorted to/ namely, the common-law one, of restraining that which does a lasting damage to the inheritance.
*153 if suclx be the law where a waste is permitted by the very terms of the lease, it will hold more forcibly in the case before us—Such is the respect of the law for the interests of those in remainder; such is its repugnance to doing a lasting injury to the inheritance, that that injury is not permitted, even by the insertion of a clause in the Deed, authorizing the commission of waste. Such a clause is held only to extend to waste of a minor character.
So in Liford’s case, (11 Co. 49 a.,) it is stated that, where a eomplaint w as made to the Parliament, (35 Id, 1.,) that the Bishop of Durham was wasting and destroying all the wood appertaining to his church, by giving and selling, and ill-keeping, and by erecting forges of iron and lead, and burning coals &c., whereby the Church would be disinherited, he was inhibited from making waste, by a Writ from the Chancery; that is, by the ordinary remedy of the common law by writ of pro» hihition.
The principle of that case entirely applies in this, The destroying the timber was not tlie less waste because it was consumed in burning of coals, or in making iron and lead: nor would it have been less so, had the iron or lead boon taken from the bowels of the soil itself. That would have been precisely analogous to the case before us, as the water manufactured into salt is taken from the premises. There is no difference in principle between the two cases,
I would therefore impose some restraint upon the appellees, as to wasting the timber. I would have some regard to the interests of those in remainder. Perhaps, however, the quantity used by King in bis lifetime, may not afford the proper standard. He might have been too niggardly in the use of his own timber, rather choosing to purchase from others than to use Ms own;—he might have wanted capital, or industry to carry on the salt-works to a proper and reasonable extent. On the other hand, he might have been too profuse in the use of his wood; he might have consulted his future interests too little. The actual state of the manufacture, also, juay *154 have been affected, at the time of his death, by vaidous external circumstances. A criterion depending merely upon the personal character of the testator, or upon ex-^raneous fleeting circumstances, is of too uncertain a eharacter to be resorted to as forming a proper standar(j> Besides^ we have no account of the quantity of the woodland, to guide us in the present instance. The use of the wood may be extravagant, or otherwise, according as the quantity of it is greater or smaller. I would therefore establish a criterion as to what is a reasonable use of the wood, taking into consideration the interest of the remainder men, as well as of the particular tenants. In doing this, the facts should be also supplied, as to the actual quantity of the land, and the timber. It can safely be done, under the direction of the Court of Chancery, by the verdict of a Jury.
As to the right of the Court of Chancery to direct, an issue in such cases, it can not be doubted. It is expressly avowed, under like circumstances, in the M. S. case of Wilson v. Bragg, cited in 7 Bac. 294. Nor can the power of the Court of Chancery to model and limit the exercise of the power, be for a moment doubted. It exists in the stronger case where the tenant holds the premises expressly without impeachment of waste. This is shewn by the case of Abraham v. Bubb, cited in 7 Bac. 290.
I will consent to the issue I have proposed, as the best means of graduating and adjusting this, matter between the parties. I will take care of the interests of the tenants, but will not consent that the heirs should be despoiled of their inheritance. I will not sanction a proceeding which will leave them no stick of timber to boil salt with, when they shall come into possession. 1 will not authorise a course, in relation to the tract of land in question, (it being* wholly unfit for cultivation after it is cleared,) which, in effect, will destroy the inheritance itself. This circumstance, in relation to the land, is not, however, necessary, in the view I have taken of the subject: it only makes my conclusion ¡stronger.
*155 A tract of land which, after it is cleared, is wholly unfit for cultivation, is rendered a non-entity by being so cleared. As for any useful purpose to the remainder-man, it might as well be sunk into the Ocean. If the timber shall ever be renewed upon it, it will not be m his time. It is, perhaps, more deteriorated than the land was, (in the case quoted,) which was destroyed by making bricks upon it. That land, though sunk into pits, might still have been built upon, and have answered that purpose. It was adjoining London. But this tract is in the western wilderness, and is therefore of no use (if it be not too steep) for the. purpose of habitation. Every thing decided in that case, (Bishop of London v. Webb,) holds therefore a fortiori in this. It so holds, also, because there was a clause of impeachment of waste in that case,—and there is none in the case before us.
I conclude, by repeating, that I will carry my view as well to the heir as the particular tenant. I will consult the interest of future times, as well as of the present; and that) especially, in relation to an article of indispensable necessity for the subsistence of the people.
This is my view of the subject; but I am overruled by the opinion of my brethren. That opinion gives the judgment of the Court, in the present instance. That judgment is, that the decree be affirmed, whereby the hill of the appellants was dismissed.

 4 Bac. Abr. Title Legacies & Devises, Letter C,; 6 Co. Rep. 16; 1 Eq. cases abr. 177.

 2 P. Wms. 338, Clavering v. Clavering